————o————

## JOHN W. LANGLOIS, Appellant, vs. ROBERT H. CRAWFORD, Respondent.

1. *Limitations—Statute of—Possession for more than ten years.*—One having the visible, actual, notorious, adverse and continued possession of lands under claim of title for more than ten years before suit brought, is protected by the statute of limitations.

2. *Spanish law—Deed not necessary to pass legal title—Identity of party making transfer may be shown by oral testimony.*—Under the Spanish law the title to land might pass by parol assignment, without deed under seal. And where the assignment was executed by one " Jacob Sharadin," it was held competent, by oral testimony, to establish his identity with one who obtained the confirmation of the tract described as " Jacob Sharadin, Jr."

3. *Acts of Congress of 1812, 1816 and 1823, confirming titles to certain lands pass to confirmee legal and equitable title of U. S. from their dates—Gibson vs. Chouteau—Statute of limitations.*—The act of congress of June 13th, 1812, confirming titles to lands in certain instances, where the same had been " inhabited and cultivated," etc., prior to December, 20th, 1803, passed the title of the United States, both legal and equitable, to the grantee *proprio vigore,* from the date of the act. The certificates from the recorder of land titles were issued for the convenience of the claimants, and were *prima facie* evidence of title; but the emanation of the title itself did not depend upon the date of the certificate, or of the patent issuing thereon.

And the same force and effect attached to the act of congress of April 29th, 1816, and February 21st, 1823. The act of congress of February 17th, 1815, for the relief of certain inhabitants of New Madrid, on which the decision in Gibson vs. Chouteau (13 Wal., 92) was based, was entirely prospective, and contained no words of present grant. Hence that decision is not in conflict with the construction placed on the other acts named. And the rule laid down in Gibson vs. Chouteau, (50 Mo., 85) that the statute does not begin to run till the issue of patent, does not apply to titles derived under those acts.

*Appeal from Cape Girardeau Circuit Court.*

*Lewis Brown,* for Appellant.

I. The Sharadin deed was competent evidence, because, under the Spanish law, before introduction of the common law. a deed was not necessary to convey land. It could be legally conveyed by parol. (Mitchell vs. Tucker, 10 Mo., 260; Long vs. Stapp, 49 Mo., 506; Allen vs. Moss, 27 Mo., 354.)

II. The statute of limitations did not begin to run until February 1874, as the statute would not apply to the United States nor their grantees, until the delivery of the patent. (Gibson vs. Chouteau, 50 Mo., 86; Same case in 13 Wall., 92.)

*Houck and Ranney & Sanford,* for Respondent.

I. The case of Chouteau vs. Gibson, (50 Mo., 85) cannot be held applicable here, because predicated upon a peculiar provision of the New Madrid act, requiring the issuance of a patent. In the present case the act of Congress operated as a grant, and a grant may as well be made by a law as by a patent pursuant to law. (Strother vs. Lucas, 12 Pet., 454; Chouteau vs. Eckhardt, 2 How., 372.)

But again, Gibson vs. Chouteau, (13 Wal., 92) cited by appellants, does not apply, because the land here in litigation was acquired by Jacob Sharadin, Jr., not under the United States but under the Spanish government; and for that reason no patent was required.

Napton, Judge, delivered the opinion of the court.

The plaintiff, Langlois, brought suit in ejectment in Nov. 1872, to recover 640 acres of survey No. 2266, in T. 29 and 30, N. range 11 east. The alleged entry is alleged to have occurred in Sept. 1868. The answer is, first, a mere denial of the allegations of the petition, and, second, a plea of the statute of limitations both of ten and twenty years.

The case was heard by the court in 1874, and a verdict and judgment for the defendant were rendered.

The bill of exceptions shows the following testimony on the trial : The plaintiff introduced a patent from the United States, on the 24th of February, 1874. This patent recites a patent certificate No. 1359, of the recorder of land titles at St. Louis, by which it appeared that by the act of April 29, 1816, (which confirmed the confirmations of Recorder Bates) there were confirmed to the representatives of Jacob Sharadan, Jr., six hundred and forty acres of land, and that said land had been surveyed in 1856, and was designated as survey 2266, which land, it is stated, was claimed as a settlement right under the 2nd section of the act of 2nd of March, 1805, and notice of which claim was given in accordance with the 7th section of the act of 30th June, 1812, and confirmed as before stated by the report of Recorder Bates, and the confirmation by congress in 1816.

It was agreed that two tracts of six hundred and forty acres each were confirmed in this township, one to Jacob Sharadin, No. 2267, and one to Jacob Sharadin, Jr., No. 2266, as shown by the plat in the bill of exceptions. There further appeared from Bates' report on February, 3, 1816, as found in Am. State papers, (Vol. 3, p. 312) the following entry : " Jacob Sharadin, Jr., representatives—Land claimed, 800 arpents—situation, waters of White river — possessed, inhabited and cultivated in 1803 and 1804. Granted 640 acres."

The plaintiff then introduced in evidence a certified copy from the books in the office of recorder of land titles of an assignment of Jacob Sharadin and others, dated February 25, 1806, as follows :

" Jeremiah Able, assignee of Ezekiel Able, claims title to 940 acres of land lying on White Water, in the district of Cape Girardeau, adjoining lands formerly claimed by Wm. Smith and Daniel Braut, which said land was granted to Wm. Murphy, and actually settled and cultivated prior to the 20th day of December, 1803, which wast ransferred by Wm. Murphy to Ezekiel Able, the 25th day of February, 1806, and recorded in the recorder's office, and assigned from said E. Able to Jeremiah Able, and the said Jeremiah Able

now claims under the original settlement and cultivation made by said Murphy." (signed) Jeremiah Able, Assignee &c. To Frederick Bates, Recorder of Land Titles, for Louisiana Terry.

" We, the undersigned persons, inhabitants of the district of Cape Girardeau, do sell and convey to Ezekiel Able of the district aforesaid, all our right, title and claim to certain lands situate, lying and being in the district aforesaid, which we held by the right of a settlement, by ourselves and families, which land (we) will forever warrant and defend unto the said Ezekiel Able, his heirs and assigns forever, from ourselves, our heirs and assigns, and from any other person or persons claiming any authority under us. In witness whereof we have hereunto set our hands and affixed our seals, this 25th day of February, one thousand eight hundred and six." Signed by Murphy, Brant and various others, and among them " Jacob Sharadin, 640 "; then follows this: " We affirm the above to be the true statement of our families. Given under our hands the above date. Test, William Murphy, &c., &c., and among others " Jacob Sharadin," [seal.] This paper is marked, " Received and recorded 25 Dec. 1806, and examined per me. Edwd. F. Bond, Recorder."

Then follows the certificate of Robert Hall, one of the U. S. justices for the Court of Common Pleas, in and for the district aforesaid, which certifies that William Murphy, being duly sworn, etc., deposeth and says that he saw the within parties sign and make their accustomary marks, and deliver the same as their own act and deed. This certificate is dated March 4, 1807. There are other certificates signed by John Byrd, but in what capacity does not appear. The entire paper and certificate are then marked " Received and recorded the 5th of March, 1807, per Ed. F. Bond, Recorder." And then follows this certificate : " I do certify that the foregoing is a true copy taken from the records of Cape Girardeau. Given under my hand this 4th day of June, 1808. George Henderson, Recorder."

Finally comes the certificate of the recorder of land titles at St. Louis, dated March 28, 1874, stating that the above

papers, certificates, etc., are correctly copied from page 127 of a book marked, Record Book E, kept by the recorder of land titles, under the provisions of the act of congress of the 2nd March, 1805—which book is up to this day preserved on file in this office. (Signed) Stilman O. Fish, Recorder."

To the introduction of all this evidence of an assignment, objections were made; 1st. because said assignment is immaterial in this case, and not made by Jacob Sharadan, Jr.; 2nd. because the assignment does not establish title to survey 2266; 3rd. because it is uncertain, and 4th. Because it is for another and different tract of land. These objections were sustained and an exception was taken.

The plaintiff then gave in evidence a sheriff's deed, made in 1855, conveying to Elizabeth Stephenson all the right, title and interest of John Able and Elizabeth Stephenson, to survey No. 2266 in town. 29 and 30, range No. 11 east, and a deed from Elizabeth Stephenson to plaintiff in 1868, conveying the same to him without warranty.

A copy of Milburn's survey in 1818, of the six hundred and forty acres confirmed to Jacob Sharadin, Jr., No. 2266, was then given in evidence.

The plaintiff then read the depositions of the following purport: Elizabeth Stephenson stated in substance that she was eighty years old; that she was a daughter of Ezekiel Able; that she knew her father bought of Jacob Sharadin, Jr. his right to survey 2266, situated on White Water in this county; thinks the sale was made in 1804; is certain the trade was made, because her father, who it seems, had a store, promised her a silk dress, but failed to comply because he sold out his goods to Jacob Sharadin, Jr., in exchange for this land. He also bought other lands of Jacob Sharadin, Sr. Up to his death, in 1820, he always claimed it as his property and often spoke of it. No one ever disputed it, so far as witness knew. Thinks it was in 1817 or 1818 the land was surveyed. This survey was by a man who acted under the direction of Rector, who was some way connected with the U. S. surveyor's office. A man by the name of Sprigg was frequently with Rector surveying, also a young man by the name of Hutch-

ing was frequently with Rector, and at the house of witness' father. This deposition was taken in March, 1874.

The next deposition read by plaintiff was that of Albert Jackson, but there is nothing material in it. He came to Cape Girardeau in 1838, and was at one time the legal adviser of Elizabeth Stephenson, and had heard of a deed from Jacob Sharadin to Ezekiel Stephenson, but never saw it.

John Able testifies that he is seventy-eight years old; that he was a son of Ezekiel Able, who died in 1821; thinks he has seen a conveyance from Jacob Sharadin for his land claim near White Water bridge, to his father, Ezekiel Able, dated in 1807; thinks he saw it in 1838, when his brother had it; that Sanford and Greer Davis had a part of it in possession in 1856 and 1858, but his sister (Mrs. Stephenson) paid the taxes on it; that Hitt was connected with it; is under the impression that Sanford, Davis and Hitt had possession since 1856, that they claimed it.

After proof of the value of rents and profits, plaintiff rested, and defendant then offered a deed from Meder, Lunn and others, in 1827, describing themselves as the only heirs and legal representatives of Jacob Sheridan, Jr., and Jacob Sheridan, Sr., to James Shackelford, both of the parish of Nachitoches, in Louisiana. It is hardly necessary to notice this deed in detail, as no proof was offered to show that Meder, Lunn and the other parties' grantors were heirs of either Jacob Sharadin, Jr., or Jacob Sharadin, Sr., (supposing the name Sheradin and Sharadan to have been the same) and there is no pretence that the deed was executed or acknowledged in conformity to our law. This deed was, however, admitted by the court, notwithstanding the objections.

The defendant then offered and gave in evidence a deed from Shackelford's administrator to one Guthrie, and a deed from Guthrie to Cobb, the death of Cobb in Tennessee, his will, and the appointment of an executor. There are then produced certain proceedings in Tennessee, probating the will of said Cobb, and appointing Th. C. Cobb administrator in 1865.

The defendant then introduced various deeds executed in 1854 and subsequently, by the sheriff of Cape Girardeau Co., and by the public administrator in charge of the estate of E. Able, made thirty-four years after Able's death, professing to convey the title of Ezekiel Able to the six hundred and forty acres of land in dispute to Greer W. Davis. It is unnecessary to recite these proceedings or conveyances. They were all admitted in evidence, but it is not pretended that they were of any validity, and they are merely relied on as giving color of title. The result was, that various deeds from the sheriff, etc., to Davis, and from Davis to Hitt, and from Hitt and Davis to Cobb, and from Cobb to defendant and sundry proceedings in the court which form the basis of these deeds are in the record, in an indiscriminate manner, and as the counsel on neither side seem to attach any importance to them, not even giving their dates in their statements, we shall omit all details. They simply encumber the record with exceptions not deemed by themselves of sufficient importance to require their notice.

After the introduction of these records and deeds the defendant submitted some oral testimony, upon which we infer the case was determined.

Benj. Lincecum stated that he had known this land for thirty years (this trial was held in 1874). No one was in possession of it when he first knew it. In 1858 Baker and Russell Sheridan took a lease from Davis and Hitt, cleared twelve acres, built a house and staid till 1860. Lope then went on and staid till 1863. Witness then went on under Davis and Hitt, (1863) staid about two and a half years. Wheeler then went on under Crawford (defendant) (1865½). After he left Sharp went on, and took a lease from witness for five years. Witness left Sharp there, and he lived there until Crawford bought. Davis and Hitt claimed and exercised control over it since 1858.

Davis stated that he knew Ezekiel Able in his life time, rented the place to Lincecum. Witness and Hitt controlled it.

The plaintiff then introduced some depositions taken in Louisiana, of Mrs. Parrott, daughter of Henry Sharadin, the object of which seemed to be to show that the deed to Shackelford was a fraud; but as that deed was a nullity at best, the testimony was useless for that purpose. Mrs. Parrott swears that she was the daughter of Henry Sharadin; that she had a brother named Jacob; that her father and herself lived in Cape Girardeau before they removed to Louisiana; that her father claimed six hundred and forty acres of land on White Water in the name of his son Jacob; that she knew of no other Jacob Sheridan than her brother; that she and her sister sold to Shackelford in 1827.

The instructions given by the court at the instance of the plaintiff are as follows:

I. The jury are instructed that a prior possession accompanied by a claim of the fee raises a presumption of title, and is sufficient to support the ejection of him who has only the naked possession, and the grantee of the person holding such prior possession, succeeds to all the rights of the possessor.

2. (This instruction relates to damages.)

3. The court sitting as a jury declares that the deed of H. M. Williams to Greer W. Davis conveyed no right, title or interest or claim in the land sought to be conveyed; that by the law in force at the date thereof, the administrator had no power or authority to sell or convey the lands in question.

4. The record of the Circuit Court, whereon is based the right of the sheriff to sell and convey to H. Sanford, does not show such a proceeding as would authorize a sale of the land on execution, and said conveyance is void.

And the court refused to give the following instructions for plaintiff:

1. "If the jury believe from the evidence that Jacob Sharadin had the possession of the land in controversy in 1803 and 1804, and that he transferred the possession thereof to Ezekiel Able after 1804, the jury will find for the plaintiff."

2. "If the jury believe from the evidence, that Jacob Sharadin and Ezekiel Able had the prior possession of the land in dispute, then the defendant must prove title to the property

in question, and if the defendant has not shown title thereto, the prior possession must prevail in this action."

3. "The jury is instructed that the deed of Jacob Sharadin dated Feb'y 25, 1806, is a valid conveyance from Jacob Sharadin to Ezekiel Able, and nothing but a valid conveyance from Ezekiel Able would affect the right of plaintiff to recover the property in dispute, until the lapse of ten years, of open, notorious, hostile and continuous adverse possession against the whole world under color or claim of title, after the date of the patent from the United States."

4. "The jury is instructed that the patent of the United States to the land in dispute is dated Feb'y 24, 1874, and that prior to this date the statute of limitations of the State of Missouri would not apply in this case."

5. "The jury is instructed that the right to this property is protected and secured to Jacob Sharadin and his legal representatives by the provisions of the 3rd Art. of the treaty between France and the United States, dated April 30th, 1803, and by the act of congress of May 20th, 1836, the title in fee to the property in question, upon the issuing of the patent, became vested in the assignee of Sharadin, to-wit: Ezekiel Able, and his legal representatives."

6. "The deed of Charles Meder, John Lunn and Rebecca, his wife, Lotney Parrott, and Elizabeth, his wife, William Carroll, and Sarah, his wife, Hannah McLane and John Sharadin, dated March 16, 1827, to James Schackelford, to the land in question, is in the action now on trial no evidence for any purpose, and the jury will disregard it entirely. Said deed and the deeds thereunder and subsequent thereto, from and to all persons claiming thereunder, convey no interest, right or title that affects this case, and the jury will disregard them."

7. The jury is instructed that the deed of Thos. P. Cobb, dated March 28, 1870, to the defendant, Robert H. Crawford, to the land in dispute, is, in this action, no evidence for any purpose, whatever, and the jury will disregard it entirely.

The court gave for the defendant the following instructions:

1st. "If the court believe, from the evidence, that the defendant, by himself or tenants, and those under whom he claims, had the visible, notorious, continued and actual adverse possession of the premises in controversy for a period of ten years next before the commencement of this suit, they will find for defendant."

2nd. "The court instructs the jury that the presumption of law is, that a party in possession of real estate has a valid title thereto, and that this presumption can be overcome only by proving title out of such party, and that if the jury believe that the defendant is in possession of the real estate in controversy, and that said real estate was confirmed to the legal representatives of Jacob Sharadin Jr., and that said Sharadin and his legal representatives never parted with the estate to any one under whom the plaintiff claims, the verdict should be for defendant."

3rd. "If the jury believe, from the evidence, that the representatives of Jacob Sharadin, Jr., conveyed to Schackelford, and Schackelford's adm'r, to Guthrie, and Guthrie to Dunn, and Dunn to Cobb, and Cobb's adm'r to defendant, and that defendant is in possession of the premises in controversy, and that the plaintiff and those under whom he claims have not been in the possession of said premises within ten years next before the commencement of this suit, then the verdict should be for defendant, provided they believe from the evidence that defendant and those under whom he claims have had and held possession of said premises during said time under claim and color of title."

Under these instructions, the court, to whom the case was submitted, found a verdict for defendant.

The record in this case seems scarcely to justify any definite conclusion on several of the points of law intended to be raised. We may consider, however, that the main points in the case are, first, whether the plaintiff showed title under the confirmation of 1816, secondly, if not, whether he could recover on prior possession, and thirdly, the bar of the statute of limitations as applied to either or both titles.

There is no controversy as to the title of Jacob Sharadin, Jr., to the tract of land sued for under the act of 29th April, 1816. The court, however, excluded an assignment or transfer of Jacob Sharadin under his seal to Ezekiel Able in 1806 —doubtless on the ground, that no evidence was offered at the time this transfer was offered, to identify the Jacob Sharadin, who made the transfer with Jacob Sharadin Jr., to whom the confirmation was made, nor any proof that the 640 acres assigned, were the tract afterwards surveyed and confirmed to Jacob Sharadin, Jr. It appears, from the report of Recorder Bates, that there were two tracts on White Water, of 640 acres each, one confirmed to Jacob Sharadin, Sr., and the other to Jacob Sharadin, Jr. One of these tracts was designated as survey 2267 ; and the other as survey 2266.

The transfer to Ezekiel Able was undoubtedly valid under the law which prevailed in 1806. (Mitchell vs. Tucker, 10 Mo., 260; Allen vs. Moss, 27 Mo., 354; Long vs. Stapp, 49 Mo., 506.) It was competent by parol evidence, to establish the identity of Jacob Sharadin, who executed the transfer with Jacob Sharadin, Jr., who obtained the confirmation. The sufficiency of such proof would be a matter of fact for the jury to determine.

The evidence subsequently introduced on this point was that of Mrs. Stephenson and John Able, both children of Ezekiel Able. The former was eighty years old, when examined, and the substance of her deposition has been already stated. She is quite positive that her father, Ezekiel Able, bought this land in 1804, of Jacob Sharadin, Jr., in exchange for a stock of goods; that he also bought land of Jacob Sharadin, Sr. She declares the land bought was the identical tract subsequently surveyed as "survey 2266." The records of the recorder's office which were offered and given in evidence by the plaintiff also showed, that Ezekiel Able was the agent before the recorder in proving both these confirmations and several others in the neighborhood of White Water.

But the plaintiff also introduced, in rebuttal on another point the deposition of Mrs. Parrott, who declared herself to be the daughter of Henry Sheridan, and who said her father

and herself lived on White Water in the early part of the century, and that her brother Jacob, was the only Jacob Sheridan that she knew of; that her father owned this claim, and had it allowed in the name of his son Jacob. This evidence, if to be credited, tended to show that the name Sheridan was ultimately substituted for Sharadin, or that the name in Mr. Bates' report was spelled on the phonetic system, which is not unlikely (as Cape "Cinque hommes" is written in his report occasionally as "Cape St. Come"). But it is not easy to understand how Henry Sheridan would cause his claim to be entered in the name of Jacob Sharadin, Jr., and the testimony of Mrs. Stephenson and her brother, John Able, tends much more strongly to establish the transfer to Ezekiel Able. The ambiguity on the face of the assignment was capable of being explained by parol, and did not make the assignment void for uncertainty, and it was error to exclude it.

Passing by this assignment, however, the exclusion of which destroyed all pretense of title in the plaintiff. from Jacob Sharadin, Jr., we have next a deed of the sheriff of Cape Girardeau in 1855, conveying all the interest of Mrs. Stephenson and John Able in survey 2266, on an execution sale against said Stephenson and Able. The plaintiff shows title under this deed. There was no proof offered to show who were the heirs of Ezekiel Able, nor whether he died intestate. It is impossible to ascertain the extent of the interest of Mrs. Stephenson and John Able in this land, supposing it to have vested in their father, Ezekiel Able, by assignment from Jacob Sharadin, Jr. This sale under execution and the deed of the sheriff are dated in 1856, about thirty-six years after the death of Ezekiel Able.

In regard to the prior possession on the part of plaintiff, or those under whom he claims, it will be observed that there was no proof of possession in E. Able, or any one else under whom plaintiff claims, since 1803 and 1804. The recorder's recommendation in 1816, is based on possession and cultivation in those years by Jacob Sharadin, Jr., and that possession would not pass to E. Able, unless E. Able acquired the title,

or the possession from Jacob Sharadin, Jr., and if he acquired the title, the question of prior possession is unimportant; and whether he so acquired the title, depends, as we have already said; upon questions of fact not submitted to the jury in this case.

As to the defendant's title, all that branch of it which is derived from Jacob Sharadin, Jr., aside from any claim of E. Able, is based upon the deed of 1827, to Shackelford, the grantors in which were married women, and none of the requisites of our statute were complied with, and that branch of the defendant's title recognizing that of E. Able is derived from the deed of the public adm'r, made about thirty-four years after E. Able's death. As no importance is attached to this title, it is unnecessary to examine it in detail. It is merely introduced to show a claim of title, under which the defendant, or his grantors, took possession. So that the merits of the case depend upon the effect of the statute of limitations unless we adopt the opinion of the Circuit Court in excluding the assignment of E. Able. But as we think the court erred in excluding that assignment, it will be necessary to consider now the title as it was affected by the statute of limitations.

The instruction asked by the plaintiff on this subject is this: "The jury is instructed that the patent of the United States to the land in dispute is dated Feb'y 24th, 1874, and that prior to this date, the statute of limitations of the State of Missouri would not apply."

This instruction was refused and the court gave the following, asked by the defendant: "If the court believe from the evidence that the defendant by himself or tenants, and those under whom he claims, had the visible, notorious continued and actual adverse possession of the premises in controversy for a period of ten years before the commencement of this suit, they will find for defendant."

As there was no dispute that Davis, etc., assumed possession under color of title, the instruction given may be regarded as sufficiently accurate to present the views entertained by the court on the facts of the case. The case of Gibson vs. Chou-

Langlois v. Crawford.

teau. (13 Wallace,) is relied on as authorizing the instruction asked for by the plaintiff.

The patent in that case was issued on a New Madrid location and survey under the act of Feb'y 17, 1815, for the relief of sufferers by earthquakes in that county. The act provided for a certificate of the recorder of land titles to the claimant, a location by the principal deputy surveyor, a survey and return of the plat to the recorder, together with a notice in writing designating the tract located, and the name of the claimant and a record of the same. It further required a return or report of the claim and location to the commissioners of the General Land Office, and a certificate of the recorder, which certificate being transmitted to the commissioner of the General Land Office should entitle the party to a patent to be issued in like manner as is provided by law for other public lands of the United States.

The act of June 13th, 1812, for settling the claims to lands in Missouri Territory, declared that the rights, titles and claims to town and village lots, etc., in certain enumerated villages or towns, which had been inhabited, cultivated or possessed prior to the 20th day of Dec. 1803, should be confirmed.

The language of the act is "shall be, and the same are hereby confirmed." And this act, it is hardly necessary to say, has been held a complete divestiture of the title of the United States from the earliest decision in this State (in Janis vs. Gurno, 4 Mo., 458) down to the present time. Yet in that case provision was made for certificates from the recorder of land titles, and these certificates were always regarded as *prima facie* evidence of title. They were a great convenience to the claimants and authorized by the law, but it was never supposed that emanation of the title depended on the date of the certificates or patents issuing on them. This court long since had frequent occasion to consider the value of the certificates of Recorder Bates, and his successor Mr. Hunt, but from the first discussion of the question, perhaps forty years ago, down to this time, the act of 1812 was

regarded as passing the title *proprio vigore*. The certificates or patents were conceded to be evidence of such titles because they emanated from the officers of the granting power and were accepted by the grantees; but a claimant if he so preferred, could always establish his title by simply showing himself within the provisions of the act without resorting to any patents or certificates. And so the act of 1816, has been considered as conferring a title from the date of the act.

The second section of this act says: "All claims embraced in the reports of the recorder of land titles acting as commissioner for ascertaining and adjusting the titles and claims to land in the territory of Missouri, dated November 1st, 1815, and Feb'y 2, 1816, where the decision of the commissioner is in favor of the claimants, shall be and the same are hereby confirmed, to-wit: Confirmations of village claims under the act of congress of 13th June, 1812, grants of the late board of commissioners appointed for ascertaining and adjusting the titles, and claims to lands in the territory of Missouri extended by virtue of the act of March 3, 1813, grants and confirmations under the several acts of congress, commencing with the act of June 13, 1812."

In Marsh vs. Brooks, (14 How.,) the Supreme Court of the United States observes: "That the confirmation of 1816, carried the title with it if the confirmation was valid, has so often been decided by this court that it is not open to discussion; nor is it disputed here on behalf of the defendant below. The confirming act of 1816, however, ordered that a patent should issue according to a survey afterwards to be made in all cases confirmed by the act. This has been done. The patent recites the necessary facts to connect the confirmation with the patent, and gives date to it by relation from the 29th April, 1816, according to the boundaries set forth in the patent."

Mr. Justice Catron, in saying that the act "ordered" the patent, perhaps uses a stronger term than is used in the act, as the 3rd section to which he refers, merely says: "In all cases not provided for by law for patent certificates to issue, every person, and the legal representatives of every person,

whose claim to a tract of land is confirmed by this or any former act, who has not already obtained a patent certificate for the same, shall, whenever his claim shall have been located and surveyed according to law, be entitled to receive from the recorder of land titles, in the State of Missouri, a certificate stating that the claimant is entitled to a patent for such tract of land, by virtue of this act, for which certificate," etc., "and the certificate shall entitle the party to a patent," etc.

In Grignon's lessee vs. Astor, (2 How., 342,) the Supreme Court gave the same construction to the act of Feb'y, 1823, which contained substantially the same language as the act of 1816. That act was for the adjustment of land claims in Michigan, and section 3rd provided that "patents shall, and they are hereby directed to be issued in the mode pointed out by law in other cases, to persons whose claims to land, town or village lots, have been regularly filed with the commissioners appointed by an act entitled," etc., "passed," etc., "May, 1820, and whose claims are contained in the report transmitted to the secretary of the treasury, and which have been reported favorably on by said commissioners; and such persons are hereby confirmed in their claims agreeably to any surveys heretofore made," etc.

Here was an express provision for patents, yet the Supreme Court held that the title passed at the date of the act and was a legal title. Mr. Justice Baldwin who delivered the opinion of the court says very emphatically in reply to the position of plaintiff's counsel that Peter Grignon had not such an estate in the premises as would authorize its sale under an order of the County Court, it being insisted that it was only an equitable title prior to the date of the patent. "The title became a legal one by its confirmation by the act of congress of Feb'y 21, 1823, which was equivalent to a patent. It was a higher evidence of title, as it was the direct grant of the fee, which had been in the United States, by the government itself, whereas the patent is only the act of its ministerial officers."

In Strother vs. Lucas, (12 Pet., 454,) the same learned judge said: "That a grant may be made by a law, as well as by a

patent pursuant to a law is undoubted, and a confirmation by a law is as fully to all intents and purposes a grant, as if it contained in terms a grant *de novo*."

In Aubuchon vs. Ames, (27 Mo., 93,) the question in regard to this act of 1816, was directly before this court, and the court said (Judge Richardson delivering the opinion): "A confirmation by this act (1816) carried the legal title, and being a direct grant of the fee by congress was the highest evidence and grade of title. No one in this State has ever doubted that land confirmed by this act was subject to taxation, that it was vendible under execution, and passed by will or deed, or under the statute of descents; and it has never been supposed that these incidents of ownership were suspended until it was the pleasure of the deputy surveyor to make the survey, or the clerks in the land department at Washington to prepare the patents. * * * Our laws from 1825 down to the present time have authorized actions of ejectment to be maintained on confirmations under the act of 1816, and there is no reason or justice and no principle of public policy why the statute of limitations should be so suspended, until a survey is made or the patent issues in favor of a title like the one in this case, on which an action of ejectment could have been maintained more than thirty years ago."

It would seem from these adjudications, both by this court and the Supreme Court of the United States, that the act of 1816 has been regarded as passing the title of the United States, both legal and equitable to the persons confirmed by the act. And it is apparent, therefore, that without expressing any concurrence with, or dissent from the views advanced by the court in the case of Gibson vs. Chouteau, they do not conflict with the construction given to the act of 1816. That case was certainly not designed to assert that congress could not as effectually part with all the title of the United States, both legal and equitable, by a direct grant by law, as they could by a patent, issued by ministerial officers under their direction. The acts of 1812, 1816, and 1823, above referred to, contained an express relinquishment of all the title of the United States,

at the date of the acts, and have been uniformly so constrned. The provisions in each of these for certificates, surveys and patents, were for the convenience of the claimants and the government. The claimant would thus be relieved from the incon-. venience of resorting to oral testimony, and the government could more readily separate the private from the public lands. And whether these views are logical or otherwise, and whether the courts of this State and of the United States were right or wrong in adopting them, the fact that they were so adopted and have prevailed so long is a cogent and, I think, sufficient reason why such construction should not now be overturned and a flood-gate opened to litigation. The patent in the present case was issued in 1874, more than half a century after congress had conveyed every particle of title which the United States had, and in fact recites the confirmation of 1816, as the basis of the patent and simply amounts to a certificate of the executive department from which it emanated that in 1816, the premises described were granted to the patentees by congress.

The act of 1815 for the relief of certain inhabitants of New Madrid was entirely prospective and did not, and indeed could not, contain any words of present grant. It left to certain ministerial officers to consummate such titles as were authorized to be created by the acts of the claimants in conjunction with the recorder and surveyor, by surveys, notices, certificates, and ultimately, patents. There was no attempt to pass the title of the government by the act itself, by any terms of immediate grant, and it may very well be that the legal title remained in the United States until the issuance of the patent. But the act of 1816 operated on claims already investigated and favorably reported on, by the agents of the government and the act declared that these claims "shall be and are hereby confirmed."

The evidence in regard to continuous possession in this case, is not satisfactory, some of the parties being, for aught that appears, mere trespassers; but we suppose the statement of Davis, that he and Hitt controlled the land since 1856, was

designed and understood to imply that all the occupants were tenants under them.

As this was a question of fact properly submitted by the instructions, and there was evidence from which a continuous adverse possession during ten or twelve years previous to the institution of the suit might be inferred, we will affirm the judgment.